DRINKWATER, Plaintiff in error, vs. THE STATE, Defendant in error.

*October 11—November 6, 1918.*

*Criminal law and practice: Homicide: Evidence: Competency: Refreshing memory of unwilling witness: Expression of opinion by trial judge: Harmless errors.*

1. Upon a trial for murder by shooting with a revolver, it was not error to permit a witness for the state, who testified that he had seen the revolver once before in a city near the place of the shooting, to state further that at that time he and the defendant went to the city together and remained two days alone in her house—such statement having been admitted to show the circumstances under which he saw the weapon, and not having been commented upon in the argument to the jury.

2. It was, in this case, within the discretion of the trial court to permit the prosecuting attorney to refresh the memory of an obviously unwilling witness for the state by calling his attention to what he had said at the coroner's inquest.

3. In a criminal case the trial judge should refrain from expressing in the presence of the jury his view as to the probative force of the evidence upon any phase of the alleged guilt of the defendant, and should rule upon objections or requests made without comment upon what the evidence shows.

4. In this case, however, the refusal to submit to the jury the question of excusable homicide and a statement by the judge to the effect that it was an undisputed fact that defendant was culpably negligent in having a revolver in her pocket and in taking it out and hammering the deceased with it as she testified she did, are *held* not to have been errors affecting any substantial right of defendant or such as should work a reversal, the jury not having found defendant guilty of killing by culpable negligence (manslaughter in the fourth degree, under sec. 4363, Stats.), but having evidently believed that she recklessly and voluntarily fired the shot regardless of the result, and so found her guilty of the higher offense of murder in the second degree under sec. 4339.

ERROR to review a judgment of the circuit court for Crawford county: GEORGE CLEMENTSON, Circuit Judge. *Affirmed.*

Plaintiff in error, hereinafter called the defendant, was convicted of murder in the second degree for the shooting

of Frank A. Drinkwater on the 25th day of March, 1918, at Bridgeport in Crawford county. In April, 1894, defendant married the deceased, and they had one son, Donovan, seventeen years old at the time of the trial in May, 1918. Defendant had been married prior to her marriage to deceased and had one daughter, Lola Andrews, by such marriage. At the time of the shooting she was forty-two years old and the deceased was thirty-nine. For at least fourteen years prior to his death the deceased had most of the time been either a bartender or saloonkeeper in various places in Southwestern Wisconsin, and the evidence showed that he drank considerably and steadily, though never to such an extent as to be helpless, and that especially when drunk he was quite quarrelsome and irritable, though the evidence on this subject is somewhat conflicting. In November, 1916, the defendant obtained a divorce from the deceased on the ground of cruel and inhuman treatment, and went to live at Prairie du Chien, but in November, 1917, at the solicitation of deceased, she returned to Bridgeport to work for him at a salary of $10 a week. She was cook, housekeeper, and assisted in tending bar. It seems that a young man by the name of Roy Pugh was somewhat attentive to the defendant, at least the deceased so thought, and it made him angry and jealous. On the evening of the shooting Pugh came into the saloon and was waited upon by the defendant. He remained about fifteen or twenty minutes and then went down the street some distance. A little later the defendant also went down the street followed by her son Donovan. Pugh was then standing in the street. She returned to the saloon, and as she was leaving the second time she testified she heard the deceased say "I will get 'em," whereupon she went back in again, got a revolver and put it inside of her stocking, and then went down the street and joined Pugh. The two walked across the covered bridge of the Wisconsin river, and while on the bridge defendant took the revolver out of her stocking because it hurt her and put it in her

right-hand sweater pocket, where she had to hold it with her right hand to keep it from falling out. Upon returning to Bridgeport they went up past the saloon toward the post-office. As they did so the deceased, who had been drinking heavily that day, came out and told her in an angry tone that she did not need to get the mail because Donovan had gotten it. She replied that he did not get her mail, and she and Pugh continued to walk up the street. The deceased threw down some stove wood he had in his arms and followed them up to the postoffice and back again, during which time angry words passed between them. She says he told her that "you are going to start something that I am going to finish for you," or that she had started something tonight and that if she was not "damn careful he would finish it." When defendant and Pugh started to go down the street the deceased stood on the walk directly in front of them and so they stepped into the street and went down the middle of it. The deceased kept pace with them on the sidewalk and the quarrel continued. As they approached the saloon the defendant walked over to the sidewalk and came quite close to it. While out in the street one Luther McKinley, a friend of both defendant and deceased, came out into the street and spoke a few words to her to the effect that she ought not to go with Pugh. She told him she was divorced from her husband and had a right to go with Pugh if she wanted to. As she approached the sidewalk in front of the saloon deceased asked her in an angry tone if she was not going to come in. She replied that she was not in any hurry. He said, "Are you coming in here?" She said, "No, I ain't," and he replied, "By God, I will show you." She also testified on both direct and cross examination that he said "Come on and get your damn rags and go to Prairie and take the cur over there and live with him," meaning Pugh, and that when he said "By God, I will show you," he grabbed hold of her left sleeve or arm with his right hand and pulled her towards the sidewalk; that he

grabbed at her throat with his left hand, and then she took the revolver out of her sweater pocket with her right hand and struck him on the hand twice, and his hand slipped down on her arm. He then got hold of her right arm with his left hand and with both hands pulled her towards him, and then the gun was discharged. The evidence of just what occurred at the scuffle is not very clear, and defendant, Pugh, and McKinley, all close eye-witnesses, differ some as to details. The deceased refused to make a statement to the doctor that evening, saying he would tell him later, but died early next morning without making any statement. The bullet entered his abdomen a little above and to the left of the navel.

The court submitted to the jury the questions of whether defendant was guilty of (a) murder in the first degree; (b) murder in the second degree; (c) manslaughter in the second degree under sec. 4351, Stats. 1915; (d) manslaughter in the fourth degree under sec. 4362, Stats. 1915; or whether the homicide was justified under sec. 4366, Stats. 1915. It refused to submit the question of whether the homicide was excusable under sec. 4367.

For the plaintiff in error there was a brief by *J. S. Earll* of Prairie du Chien and *C. J. Smith* of Viroqua, and oral argument by *Mr. Earll*.

For the defendant in error there was a brief by the *Attorney General* and *J. F. Baker* and *J. E. Messerschmidt*, assistant attorneys general, and oral argument by *Mr. Messerschmidt*.

VINJE, J. Error is assigned because the witness Pugh, after testifying on behalf of the state that he had seen the gun used by defendant once before in Prairie du Chien about the 20th of March, was permitted to state that defendant and he came to Prairie du Chien together and that they remained two days alone in her house. On cross-examination he testified that he came to get some books from her and

that nothing improper occurred between them while he was there. It is urged that this testimony served to prejudice the jury against defendant and should not have been admitted. Its relevancy is not very great. It was probably admitted to show the circumstances under which he saw the gun so that there could be no mistake about the fact that he did see it. That such circumstances were of a character perhaps somewhat prejudicial to defendant was due to her own conduct. There is nothing in the record to show that this evidence was in any way commented upon in the argument of the case to the jury and we cannot say that its reception was error, much less prejudicial error.

It is further claimed that the court erred in permitting the state to cross-examine or impeach its own witness, Pugh. Upon the trial he was quite vague and indefinite as to what he saw and heard at the time and just preceding the firing of the fatal shot. He said the shot came from the direction of the defendant and thought she had her right hand in front of her; that was about as much as he could remember he saw. Questions and answers taken from his testimony given before the coroner's inquest the next day after the shooting were then read to him and he admitted he made answers as therein contained or else that he did not remember. His testimony at the inquest was to this effect: He was right by defendant's side when she fired the shot; saw the gun in her hand; saw her fire it, and that it seemed to be aimed at the stomach of deceased. It was evident that Pugh was an unwilling witness on the part of the state at the trial. But he was one of the only two eye-witnesses to the shooting besides the defendant and had to be called by the state. A wide discretion must be allowed trial courts in permitting counsel to refresh the recollection of a witness that apparently does not wish to remember. Here nothing more was done. The testimony taken before the coroner was not introduced. No impeachment of his testimony was attempted, but his recollection was sought to be refreshed by

calling his attention to what he said upon the inquest. It was within the discretion of the trial court to permit that to be done with this witness under all the circumstances shown. The trial court could better judge of the unwillingness of the witness than we can, though that appears clearly enough from the record.

The court was asked to submit the question of excusable homicide, but refused to do so, saying in the presence of the jury, "Now, according to defendant's own testimony she had that revolver, she had it in her right-hand pocket, and she took it out; that she began to hammer Drinkwater with that revolver, and if it went off it was the result of culpable negligence. She had absolutely no right, under any of the facts in this case, to have that revolver in her pocket to be taken out at that time, to take it out and to hammer him with it or to handle it in any such way that it might go off and kill anybody;" and later, in reply to a remark of counsel for defendant, the court said: "Yes, I know that. But I say that where it is absolutely an undisputed fact that the defendant was culpably negligent, and that that was the cause the revolver went off, I won't stultify myself by giving an instruction that would warrant the jury in finding that it was excusable, accidental." Without stopping to consider whether the court was not technically correct in saying that defendant had no right to carry a concealed weapon or to take it out and hammer the deceased with it as she testified she did, we will assume that the remarks had some tendency to prejudice her before the jury. The court emphatically declared that she was culpably negligent. Had the jury found her guilty under sec. 4363, Stats., declaring that "Every other killing of a human being by the act, procurement or *culpable negligence* of another, where such killing is not justifiable nor excusable, . . . shall be deemed manslaughter in the fourth degree," there would be much more room for an argument that the jury were influenced by the court's remarks. But they negatived that crime and found

her guilty of a higher one, where an imminently dangerous act, evincing a depraved mind regardless of human life, is the chief ingredient. Under our present practice and the beneficent provisions of sec. 3072m, it is not alone sufficient to show error to work a reversal, but error of such a character must be shown as to satisfy this court that but for such error a result materially more favorable to the appellant would probably have been reached by the jury. *Hommel v. Badger State Inv. Co.* 166 Wis. 235, 243, 165 N. W. 20, and cases cited. The error must affect a substantial right and we must be satisfied that substantial justice has not been done before we reverse. Here we have a situation where a woman in the presence of two strong, active men, both her friends, in the middle of a village street in the early evening, takes a revolver out of her pocket and begins to hammer the deceased over the arm because he has hold of her by the arm or sleeve and wants her to come into their saloon for the purpose, as she says, of having her get her clothes and go away with her companion. Evidently the jury thought she was in no bodily danger and that she must have known that fact because they negatived self-defense. They also evidently believed that she recklessly and voluntarily fired the gun regardless of the result. Can we say from the evidence that they were not justified in so believing and finding? It seems not. We are satisfied that justice has been done— hence none of the alleged errors should work a reversal. It were better, however, in criminal cases for trial judges to refrain from expressing their views in the presence of the jury as to the probative force of the evidence upon any phase of the alleged guilt of the defendant, and simply rule upon the objections or requests made without comment upon what the evidence shows.

*By the Court.*—Judgment affirmed.